Mr. Justice Field
delivered the opinion of the court:
The appellants seek a reversal of the decree in this case on grounds which amount substantially to these: 1st. That the United States were the owners of the injured vessel, by the terms of the charter-party, during the continuance of the *35 service stipulated, and were consequently responsible for the damages sustained by the vessel whilst engaged in that service. 2d. That the damages to the vessel were occasioned by her running an extraordinary marine risk under compulsion from the United States, and for indemnity against such damages the charter-party stipulated.
I. There is no doubt that under some forms of a charter-party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows must depend upon the terms of the charter-party considered in connection with the nature of the service rendered. The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case the charter-party is a contract for the lease of the vessel; in the other, it is a contract for a special service to be rendered by the owner of the vessel.
In examining the adjudged cases on this subject we find some differences of opinion, especially in the earlier cases, as to the effect to be given to certain technical terms used in the charter-party in determining whether the instrument parts with the entire possession and control of the vessel, but no difference as to the rule of law applicable when the construction is settled. All the cases agree that entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the. charterer before he can be held as special owner for the voyage or other service mentioned. The retention by the general owner of such command, possession] and control is incompatible with the existence at the same time of such special ownership in the charterer. Christie v. Lewis, (2 Brod. & Bing., 410, 434.) Marcardier v. The Chesapeake Insurance Company, (8 Cranch, 39, 49.) The Schooner Volunteer and *36 Cargo, (1 Sumner, 551, 556.) Drinkwater v. Freight and Cargo of Brig Spartan, (Ware, 145, 154.) Donahoe v. Kettell, (1 Clifford, 135.) Holt on Shipping, 461-471.
If, now, in the light of these observations we look at the charter-party in this case, we shall ñnd little difficulty in disposing of the first ground for reversal presented by the appellants. The vessel here was chartered for the purpose of plying in the harbor of Port Eoyal, in South Carolina, or for such other service as the Government might designate, and the provisions which the charter-party contains on the part of the owners sound only in covenant. By it they engage that during the existence of the charter the vessel shall be kept tight, staunch, well fitted, tackled, and provided with every requisite, and with the necessary men and provisions; that the whole of the vessel, with the exception of the necessary room for the accommodation of the crew and the storage for the cables and provisions, shall be at the sole use and disposal of the Government; that no goods or merchandise shall be laden on board otherwise than from the Government, or with the assent of its agent, on pain of forfeiture of the amount that may become due on the charter; and that the owners will receive on board all lawful goods and merchandise which the Government may think proper to ship. In consideration of these stipulations the United States agree that the owners shall receive the sum of $250 per day for each day the vessel is retained under the charter, and that they will supply the vessel with coal; and in case the vessel, while executing the orders of the Government, shall be destroyed or damaged by a hostile force, or by being compelled to run any extraordinary marine risk, that the owners shall be indemnified.
The stipulations here designated on the part of the owners imply the possession and command of the vessel by them, and would be inconsistent with such position and command by the Government.
Stipulations that the general owners shall keep the vessel in good condition during the existence of the charter and receive on board certain goods at the request of the Government, and refuse to receive other goods without its assent, would be out of place and inappropriate if the Government were, at the same time, special owners of the vessel for the service stipulated, having the vessel in its entire possession and control., Great weight was given to similar clauses by the King’s Bench in *37 Saville v. Campion, (2 Barn. & Ald., 511,) and by the Supreme Court of New York in Clarkson v. Edes, (4 Cowen, 477.) In each, of these cases they were held conclusive that the possession and control of the vessel had not passed to the charterer, but had been retained by the general owner.
The fact that the service stipulated in the present case was to be rendered for the Government cannot alter the natural import of the terms used in the charter-party, or change its construction, although in a doubtful case that fact might be entitled to much consideration.
II. The second ground presented by the appellants for a reversal of the decree is readily answered. The risk that the vessel incurred in complying with the orders of the harbormaster was not an extraordinary marine risk within the meaning of the charter-party. The term extraordinary is there used to distinguish an unusual risk which-the-vessel might be compelled to run, by order of the Government, from those risks which would be covered by an ordinary marine policy and which might be expected to arise from the service in which the vessel was engaged. The contract of the Government was not intended to apply to the usual risks attendant upon the performance of a service such as was here mentioned, but risks outside and beyond them.'
The risk incurred was of a possible collision with a sunken anchor in the harbor. This was an ordinary risk which every vessel must run that enters a harbor, and is one which every marine policy covers.
Decree affirmed.